## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SWEET MAMA'S, LLC** | * | |
| **DBA NAMAN'S CATERING** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **v.** | * | **CIVIL ACTION NO.:** |
| | * | |
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **Defendant** | * | |

## COMPLAINT

Plaintiff SWEET MAMA'S, LLC ("NAMAN'S CATERING") brings this action against the United States pursuant to 26 U.S.C. § 7422, for a refund of internal revenue taxes totaling $364,535.53 (plus interest) owed to it (the "ERC refunds")– and wrongfully denied by the Internal Revenue Service ("IRS") – as Employee Retention Credits ("ERC") [1].  Under the Coronavirus Aid, Relief, and Economic Security Act, PL 116-136, March 27, 2020, 134 Stat 281 ("CARES Act") and Internal Revenue Code § 3134, which created the ERC, Plaintiff is entitled to ERC refunds for the tax periods ending March 31, 2021 ("Q1 2021") and June 30, 2021 ("Q2 2021").

## NATURE OF ACTION

1.    Plaintiff files this civil action under I.R.C. § 7422 for the recovery of employment taxes, including the refundable excess credit (together with statutory interest and any appropriate attorney fees), authorized to be paid to Plaintiff under the CARES Act and I.R.C. § 3134 but wrongfully denied by the IRS. This Complaint is timely under 28 U.S.C. § 2401 and under I.R.C. §§ 6532 and 7422, as Plaintiff's ERC claims were duly filed more than 6 months prior to the filing

---

[1] Employee Retention Credits or ERC are also interchangeably referred to as Employee Retention Tax Credits or ERTC.

of this Complaint.[2]

## PARTIES

2.      Plaintiff NAMAN'S CATERING is a family-owned catering business with its principal place of business in Mobile County, Alabama.

3.      The Defendant is the United States of America.

## JURISDICTION AND VENUE

4.      Jurisdiction in this Court is proper under 28 U.S.C. §§ 1331, 1340, and 1346(a)(1), and under 26 U.S.C. (I.R.C.) § 7422.

5.      Venue in this Court is proper under 28 U.S.C. § 1402(a)(2) and 1391(e)(1), as Plaintiff's principal place of business is located in this judicial district.

6.      This Complaint is timely under 28 U.S.C. § 2401(a) and under I.R.C. §§ 6532(a)(1) and 7422(a) because Plaintiff duly filed a claim for its ERC refund with the Secretary more than six months prior to the date of filing this Complaint.

## THE EMPLOYEE RETENTION CREDIT

7.      Beginning in 2020, the COVID-19 virus created a global pandemic that swept through all fifty states and resulted in governmental orders to address the pandemic that disrupted the United States' local and national economies. Those orders formed a nexus of federal, state, and local government mandates that created a comprehensive regulatory scheme limiting commerce, travel, and group meetings with the objective to limit the spread of COVID- 19. The governmental response to that public health emergency involved historically unprecedented measures, including lock down orders, social distancing mandates, and forced business closures. The economic effects of those policies were profound. Deemed the "greatest threat to prosperity and well-being the US

---

[2] See Exhibit "A"-Plaintiff's 941X for Q1 2021 and Q2 2021, and Form 2848 Power of Attorney that was attached to each 941X.

has encountered since the Great Depression[,]" the estimated cumulative financial costs of COVID-19 were forecast at $16 trillion.[3]

8.      In response to the COVID-19 pandemic, the federal government enacted sweeping economic measures to assist American businesses and citizens, including the CARES Act, enacted in March 2020. Section 2301 of the CARES Act created the ERC.

9.      The ERC is a broad-based, fully refundable tax credit designed to stimulate economic recovery, support job retention, encourage business sustainability, and mitigate the impacts on U.S. businesses from the unprecedented challenges posed by the pandemic. Congress intended for the credit to be broadly applicable to help businesses survive a historic pandemic that disrupted the global economy. The credit is available to certain eligible employers for the last three quarters of 2020 and for the first three quarters of 2021.

10      The ERC is a payroll tax credit available to certain employers who qualify under the CARES Act.  Employers file an amended quarterly payroll tax return (a 941X) with the IRS to claim the ERC credit.

**Threshold Requirement**

11.      An employer is eligible to claim an ERC if it carried on a trade or business during the quarter at issue and satisfies one of three prongs for eligibility: (1) declining gross receipts; (2) full or partial suspension of operations due to government orders, or (3) recovery startup business[4]. CARES Act § 2301(c)(2); I.R.C. § 3134(c)(2).[5]

---

[3] Alvin Powell, *What might COVID cost the U.S.? Try $16 trillion, The HARVARD GAZETTE, Nov. 10, 2020*. https://news.harvard.edu/gazette/story/2020/11/what-might-covid-cost-the-u-s-experts-eye-16-trillion/.

[4] Plaintiff is not a "recovery startup business" as defined under I.R.C.§3134(c)(2)(A)(ii)(III), and so it does not claim ERC credits thereunder.

[5] The current version of I.R.C. § 3134 became effective on November 15, 2021 and, as relevant here, is identical to the version of I.R.C. § 3134 in effect from March 11, 2021, to November 14, 2021, and to the version of the CARES Act in effect from January 1, 2021, to March 10, 2021. For ease of reference,

**Declining Gross Receipts Test**

12.    Under the declining gross receipts prong, for the year 2021, the employer is eligible to receive ERC if "the gross receipts . . . of such employer for such calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019." 26 U.S.C. § 3134 (c)(2)(A)(ii)(II).[6]  In other words, if the employer suffered a decline in gross receipts of greater than 20 percent for the claimed quarter in 2021, when compared to the same quarter in 2019, the employer is eligible to receive the ERC for that 2021 claimed quarter.

**Alternative Gross Receipts Test**

13.    Additionally, for any quarter in 2021 for which the ERC is claimed, Congress provided an alternative way to determine whether the declining gross receipts test is met by the taxpayer.    For    this    alternate    test,    a    taxpayer    may    elect    to    use    an immediately preceding quarter's receipts to qualify, i.e. to show there was a 20 percent reduction in gross receipts qualifying it for the ERC in 2021.

14.    Specifically, § 207(d)(2) of the Coronavirus Response and Consolidated Appropriations Act of 2021 ("CAA")[7] added a provision that has been interpreted by the IRS to permit employers to calculate gross receipts using an ***alternate preceding quarter*** (rather than the quarter for which the ERC is claimed).

In Notice 2021-23, the IRS states:

[S]ection 2301(c)(2)(B) of the CARES Act, as amended by section 207(d)(2) of the Relief Act, permits an employer to elect to use an alternative quarter to calculate gross receipts. Under this election, an employer may generally determine

---

this Complaint cites I.R.C. § 3134 when discussing 2021 ERC requirements.

[6]  The percent decline in gross receipts for 2020 calendar quarters was more stringent and required a 50 percent decline in gross receipts when compared to the same quarter in 2019.  CARES Act § 2301(c)(2)(B)(ii).

[7]  PL 116-260, December 27, 2020, 134 Stat 1182.

if the decline in gross receipts test is met for a calendar quarter in 2021 by comparing its gross receipts for the immediately preceding calendar quarter with those for the corresponding calendar quarter in 2019. . . .

Accordingly, for the first calendar quarter of 2021, an employer may elect to use its gross receipts for the fourth calendar quarter of 2020 compared to those for the fourth calendar quarter of 2019 to determine if the decline in gross receipts test is met. . . .

For the second calendar quarter of 2021, an employer may elect to use its gross receipts for the first calendar quarter of 2021 compared to those for the first calendar quarter of 2019 to determine if the decline in gross receipts test is met. . . .

*Guidance on the Employee Retention Credit under the CARES Act for the First and Second Calendar Quarters of 2021*, IRS Notice 2021-23.

Likewise, for the third calendar quarter of 2021, an employer may elect to use its gross receipts for the second calendar quarter of 2021 compared to those for the second calendar quarter of 2019 to determine if the decline in gross receipts test is met.

In other words, if a taxpayer qualifies under the gross receipts test for the first quarter in 2021, then it automatically qualifies for ERC for the second quarter in 2021 under the alternative gross receipts test, regardless of the whether there was any decline in gross receipts at all during the second quarter of 2021.

15.    Plaintiff NAMAN'S CATERING claimed ERC credits for Q1 2021 and Q2 2021. The IRS has taken no action on Plaintiff's claims, which is the subject of this suit for refund, for more than six months.

16.    NAMAN'S CATERING is an eligible employer because it suffered a decline in gross receipts using both the gross receipts test and the alternate gross receipts test. For NAMAN'S CATERING, these tests are met because there was a decline in the taxpayer's gross receipts greater than 20 percent for both Q1 2021 and Q2 2021 and Q1 2021 (the alternate quarter) when compared to the same quarters in 2019.

### The Suspension Test

17.     Apart from the gross receipts test, an employer can also qualify as an eligible employer to receive ERC using the suspension test.  Under this second prong for determining eligibility, an employer is eligible to claim ERC credits if "the operation of [Plaintiff's] trade or business [was] fully or partially suspended . . . due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." I.R.C. § 3134(c)(2)(A)(ii)(I). NAMAN'S CATERING clearly meets this prong.

18.     Eligibility under I.R.C. § 3134(c)(2)(A)(ii)(I), providing the suspension test for eligibility, contains no financial element whatsoever.

19.     I.R.C. § 3134(c)(2)(A)(ii)(I) does not require eligible employers to have suffered any decline in gross receipts to qualify for ERC credits using the suspension test.

### The ERC Generally

20.     Employers who qualify for the ERC for the first three quarters of 2021 may receive a credit of up to $7,000 per employee for each quarter in which they qualify.

21.     The amount of ERC is not limited to the amount of employment taxes the employers paid, and against which the credit is applied. Rather, if the amount of the credit exceeds the applicable employment taxes for the calendar quarter, "such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b)." CARES Act § 2301(b)(3); I.R.C. § 3134(b)(3).

22.     A full or partial suspension does not require the employer to actually shut down its operation completely for any period of time.[8]

---

[8]  In fact, IRS Notice 2021-20 interprets a partial suspension to occur if the employer's operations "are subject to modification due to a governmental order (for example, to satisfy distancing requirements),

6

## NAMAN'S CATERING

23.    NAMAN'S CATERING is a corporation that operates a family-owned catering and food service business in and around Mobile County, Alabama.  Plaintiff's principal place of business is located in Mobile, Alabama.

24.    NAMAN'S CATERING has one main facility in Mobile, Alabama, with general hours of operation from 5am-7pm, 7 days per week. Office staff perform administrative functions, bookkeeping, customer service, and purchasing. Other departments include distribution, the warehouse, and the kitchen operations. Employees work either in the office, in distribution, in the warehouse, in the kitchen, and/or on-site at events as servers. For its workflow, customers call in, NAMAN'S CATERING takes the customer's order, schedules the date to fulfill orders, and creates a full write up of the order for the kitchen. The jobs are planned, and employees work the jobs. For events NAMAN's serving staff have to load food into company vehicles, go out to various jobs sites, work the event/job, load the vehicle at the end of the event/job, then return to NAMAN'S CATERING, and unload the vehicle. Food is prepared in-house, and cooks also prepare dishes at the customer's location. NAMAN'S CATERING provides catering services for events such as weddings, family functions, and corporate functions.

25.    Before the pandemic, NAMAN'S CATERING also serviced twelve (12) cafeterias daily which accounted for about 20% of NAMAN'S CATERING's total revenue. Mardi Gras events accounted for 10% of NAMAN'S CATERING's sales, and corporate businesses generated about 25%-30% of NAMAN'S CATERING's business. Before the pandemic, NAMAN'S CATERING serviced 200-250 events per month.

---

[then] such a modification of operations is considered to be a partial suspension of business operations due to a governmental order if the modification required by the governmental order has more than a nominal effect on the business operations under the facts and circumstances." *Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief and Economic Security Act (Answer 17).*

26.    When the pandemic began, pursuant to government orders, NAMAN'S CATERING was ordered to shut down. All of its catering jobs were cancelled because of government restrictions on gatherings, social distancing, and capacity. As a result of government restrictions, no events were taking place causing NAMAN'S CATERING to have no sales and business. Indeed, all of its catering jobs were cancelled. Despite these extreme setbacks, NAMAN'S CATERING attempted to re-open its business during the pandemic. Upon reopening, NAMAN'S CATERING employees followed government ordered social distancing and quarantining requirements, wore required Personal Protective Equipment or "PPE", and performed enhanced cleaning. NAMAN'S CATERING had to stagger employee shifts to follow social distancing requirements. Restrictions and extra safety measures added more work to employees' workloads. Everyday tasks took 20% or longer to complete. Employee productivity decreased by 20% or more. In fact, NAMAN'S CATERING was paying the same labor costs for 20% or less employee productivity which, of course, decreased NAMAN'S CATERING's profit margins. NAMAN'S CATERING had to restructure services for the jobs that NAMAN'S CATERING did book, which were very greatly reduced in number. Other issues NAMAN'S CATERING faced due to governmental orders included having to make individual packaging for all foods served. According to government directives, no open food was permitted. NAMAN'S CATERING followed the rules of the Mobile County Health Department among other government orders which included State Orders and OSHA Orders.

27.    Networking events were canceled because of gathering, social distancing, and capacity restrictions causing NAMAN'S CATERING to lose opportunities to perform catering jobs, network and market to improve its business. Before the pandemic, NAMAN'S CATERING serviced approximately 200-250 events per month. During the pandemic NAMAN'S CATERING

booked less than 35 events/jobs per month through May 2021. NAMAN'S CATERING lost all cafeteria business and this business has never returned. The cafeteria work accounted for approximately 20% of NAMAN'S CATERING's revenue before the pandemic.

28.     Restrictions due to government orders from an appropriate governmental authority had the effect of both fully and partially shutting down NAMAN'S CATERING and had a greater than nominal impact on NAMAN'S CATERING's productivity, revenue and operations.

29.     Because Plaintiff NAMAN'S CATERING's operations were partially suspended due to government orders that meet the statutory criteria for the claimed quarters in 2021, NAMAN'S CATERING is entitled to its claimed, but wrongfully denied, ERC, plus interest and attorney fees and costs.

### First Quarter 2021

30.     On or about January 29, 2024, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q1 2021. ("Q1 2021 Form 941-X").

31.     Line 18a of the Q1 2021 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $17,547.47.

32.     Line 26a of the Q1 2021 Form 941-X reported that Plaintiff's refundable portion of ERC was $160,086.79.

33.     Line 30 of the Q1 2021 Form 941-X reported $244,929.52 in qualified wages for the ERC.

34.     Line 31a of the Q1 2021 Form 941-X reported $8,872.28 in qualified health plan expenses for the ERC.

35.     Based upon the foregoing, Plaintiff duly filed  claimed an ERC for Q1 2021 in the

amount of $177,661.26.

36.    The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q1 2021.

## Second Quarter 2021

37.    On or about January 29, 2024, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q2 2021. ("Q2 2021 Form 941-X").

38.    Line 18a of the Q2 2021 Form 941-X reported that Plaintiff's non-refundable portion of ERC was $21,388.65.

39.    Line 26a of the Q2 2021 Form 941-X reported that Plaintiff's refundable portion of ERC was $165,485.61.

40.    Line 30 of the Q2 2021 Form 941-X reported $258,090.96 in qualified wages for the ERC.

41.    Line 31a of the Q2 2021 Form 941-X reported $17,301.60 in qualified health plan expenses for the ERC.

42.    Based upon the foregoing, Plaintiff timely claimed an ERC for Q2 2021 in the amount of $186,874.27.

43.    The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q2 2021.

## CAUSES OF ACTION

44.    Pursuant to I.R.C. § 7422, a taxpayer may file a civil action against the United States for the recovery of taxes after a claim for refund has been duly filed with the Secretary.

45.    Pursuant to I.R.C. § 6532, no suit for refund shall begin before the expiration of six

months from the date of filing the claim for refund, nor after the expiration of two years from the date the Secretary notifies the taxpayer that its claim has been disallowed.

46.    Plaintiff satisfies each of these requirements.

47.    Plaintiff qualified for the ERC in Q1 2021 and Q2 2021 under the gross receipts test, the alternate gross receipts test and the suspension test.

48.    The IRS has not issued a disallowance or 105C letter for Q1 2021 or Q2 2021.

49.    Plaintiff's claims for Q1 2021 and Q2 2021 have been pending for more than six months.

50.    Plaintiff is entitled to the full amount of ERC claimed, together with interests pursuant to I.R.C. § 6611, as well as reasonable attorney fees and legal costs associated with this cause of action, pursuant to 28 U.S.C § 2412 and/or I.R.C. § 7430.

### Count One
### Q1 2021 Refund Claim

51.    Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

52.    Plaintiff is an eligible employer qualified to receive $177,661.26 of ERC in Q1 2021.

53.    On or about January 29, 2024, Plaintiff duly filed a Form 941-X claiming an ERC for Q1 2021 in the amount of $177,661.26.

54.    Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $177,661.26, along with statutory interest.

### Count Two
### Q2 2021 Refund Claim

55.    Plaintiff repeats, realleges, and incorporates by reference herein all preceding

paragraphs as though fully set forth herein.

56.     Plaintiff is an eligible employer qualified to receive $186,874.27 of ERC in Q2 2021.

57.     On or about January 29, 2024, Plaintiff duly filed a Form 941-X claiming an ERC for Q2 2021 in the amount of $186,874.27.

58.     Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $186,874.27, along with statutory interest.

**Count Three**
**Attorney Fees and Administrative Costs**

59.     Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

60.     In addition to its refund and statutory interest, Plaintiff is also entitled to its administrative costs, including attorneys' fees.

61.     The Defendant must pay reasonable litigation and administrative costs to a prevailing party unless its position in the proceeding was "substantially justified." I.R.C. § 7430(c)(4)(B).

62.     In failing to pay Plaintiff's ERC claims that were objectively due based upon gross receipts and/or based upon the full or partial suspension of Plaintiff's operations as provided for in the clear language under I.R.C. § 3134, the Defendant's position was not substantially justified.

**JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all issues so triable.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court enter a judgment against Defendant, the United States of America, for:

(A)    A tax refund for Q1 2021 representing ERC in the amount of $177,661.26, with statutory interest thereupon;

(B)    A tax refund for Q2 2021 representing ERC in the amount of $186,874.27, with statutory interest thereupon;

(C)    Reasonable litigation and administrative costs, including attorneys' fees, as allowed by law; and

(D)    All other relief as this Court deems necessary.

Respectfully submitted, this the 25th day of March, 2025

> */s/ Keith B. Franklin*
> _____
> E.J. SAAD          (ASB 8614D51E)
> MATTHEW ANDREWS    (ASB 1672E47A)
> JAMIE F. LEE       (PRO HAC)
> KEITH B. FRANKLIN  (ASB 8196A56K)
> *Attorneys for Plaintiff SWEET MAMA'S, LLC d/b/a Naman's Catering*

**OF COUNSEL:**

**E. J. SAAD LAW FIRM**
6207 Cottage Hill Road, Ste. G
Mobile, AL 36609
Phone: 251-660-0888
ejsaad@ejsaadlaw.com
mandrews@ejsaadlaw.com
jaimelee@ejsaadlaw.com
k.franklin@ejsaadlaw.com